**JICARILLA APACHE TRIBE, Plaintiff, Appellant, Cross-Appellee,**

v.

**SUPRON ENERGY CORPORATION, Southland Royalty Company, James G. Watt, Secretary of the Interior, Gas Company of New Mexico, Defendants, Appellees, Cross-Appellants,**

**Exxon Corporation, Defendant, Cross-Claimant, Appellee, Cross-Appellant,**

**State of New Mexico, Applicant in Intervention and Appellant in 81–1680.**

**Nos. 81–1680, 81–1860, 81–1871 to 81–1874 and 81–1939.**

United States Court of Appeals, Tenth Circuit.

Feb. 24, 1984.

Rehearing Granted March 30, 1984.

Robert J. Nordhaus and B. Reid Haltom
of Nordhaus, Haltom & Taylor, Albuquer-

que, N.M., for plaintiff, appellant, cross-appellee Jicarilla Apache Tribe.

Bruce D. Black of Campbell, Byrd & Black, P.A., Santa Fe, N.M. (Kemp W. Gorthey, Santa Fe, N.M., with him on the brief), for defendant, appellee, cross-appellant Supron Energy Corp.

Peter J. Adang and Susan Stockstill Julius of Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, N.M. (John R. Cooney, Albuquerque, N.M., with them on the brief), for defendant, appellee, cross-appellant Southland Royalty Co.

Christopher Harris, Atty., Dept. of Justice, Washington, D.C. (Carol E. Dinkins, Asst. Atty. Gen., Anthony C. Liotta, Deputy Asst. Atty. Gen., Land and Natural Resources Div., Washington, D.C., William L. Lutz, U.S. Atty., Raymond Hamilton, Asst. U.S. Atty., Albuquerque, N.M., and Edward J. Shawaker, Atty., Dept. of Justice, Washington, D.C., with him on the brief, William R. Murray, Jr., Dept. of the Interior, Washington, D.C., of counsel), for defendant, appellee, cross-appellant James G. Watt, Secretary of the Interior.

Gary R. Kilpatric of Montgomery & Andrews, P.A., Santa Fe, N.M. (Edward F. Mitchell and Mark F. Sheridan, Santa Fe, N.M., with him on the brief), for defendant, appellee, cross-appellant Gas Co. of New Mexico.

J. Douglas Foster of Hinkle, Cox, Eaton, Coffield & Hensley, Roswell, N.M. (Harold L. Hensley, Jr., Roswell, N.M., with him on the brief), for defendant, cross-claimant, appellee, cross-appellant Exxon Corp.

Thomas L. Dunigan, Asst. Atty. Gen., State of N.M., Santa Fe, N.M. (Jeff Bingaman, Atty. Gen., and Bill Primm, Asst. Atty. Gen., Santa Fe, N.M., with him on the brief), for State of N.M., applicant in intervention and appellant in 81–1680.

Kenneth J. Guido, Jr., Reid Peyton Chambers, Harry R. Sachse, Lloyd B. Miller, Kevin A. Griffin and Loftus E. Becker, Jr. of Sonosky, Chambers, Sachse & Guido, Washington, D.C., filed a brief on behalf of amici curiae Shoshone and Arapahoe Indian Tribes.

Before SETH, Chief Judge, McWILLIAMS and SEYMOUR, Circuit Judges.

SETH, Chief Judge.

These are consolidated actions and appeals wherein the plaintiff asserts a series of claims arising from oil and gas leases executed 25 or 30 years ago. There are several separate issues raised on appeal concerning computation of royalty, development and antitrust claims. The gas production was from wells located on the Jicarilla Reservation and was sold and consumed in New Mexico.

*Issues Relating to Value of Gas*

The trial court, 479 F.Supp. 536, held for all practical purposes that the defendants should have paid royalty computed on a "value" which was derived from the total net amount realized by the Lybrook processing plant for all products it developed from the gas it received from Southern Union which in turn had been purchased from and at the leases of the defendants on the Jicarilla Indian lands.

The court required that there be a "dual accounting" by *all lessees* which meant that there be determined both the price received by the lessees for wet gas at the wellhead where title passed, but adjusted for btu content; and secondly, that there be ascertained the value of the several products derived from the gas stream, and sold by the Lybrook plant operator/owner. This product figure was to be a net figure or "net realization." The trial court held that the royalty from all leases concerned should be computed on the larger of the two figures. The court thus mandated that the "value" based on plant product values (or net realization) be determined, and be used as an alternate whether or not the lessee paying the royalty had any interest in the processing plant and whether or not the lessee received any added compensation for the products developed by the plant. This blanket requirement was contrary to the position taken by the Secretary through the years. The requirement of "dual accounting" required of all lessees by the trial court

is one of the several basic issues raised on this appeal. It has a facet which involves the Secretary of Interior as the trial court also held that this dual accounting should have been required by the Secretary from the outset and since it was not done there was thereby a breach of fiduciary duty.

The leases were executed in the early 1950's and the regulations then in effect were not changed since that time in any respect material to this problem up to the time in 1979 when the trial court entered orders directed to dual accounting. From 1950 to 1979 without exception, and without variation, the Secretary and the USGS had construed the lease provisions and the regulations to require dual accounting not by all lessees, but *only* in instances where the lessee owned the processing plant (or received added money for its products).

The trial court's holding was thus contrary to a long uniform administrative construction and application of the regulations and the lease provisions. The trial court did not build on any basis in the administration actions, but instead developed a wholly new interpretation. It made no finding that the Secretary or the USGS had acted through the years with any abuse of discretion or in an arbitrary and capricious manner.

The record shows that Supron was the only defendant which at any material time had an interest in the Lybrook plant. This interest was recognized at the time it existed by the USGS in its construction of the lease and regulations. Thus royalty requirements and reports by it were based on product value. This is an example of the consistent application of administrative construction. Since no other defendants had such an interest no such requirement was placed on them until the trial court sought to apply product values to all lessees although the plant was operated/owned by strangers whose operations and costs were not before the court and no reason was advanced as to why they would be made available to the defendants. The plant also processed gas from the general area thus from leases not here concerned. It is located outside of and about 20 miles west of the reservation boundary.

### Lease Provisions

The lease provision in paragraph 3(c) [in Southland leases] provides that the royalty at 16⅔% be computed on:

"the value or amount of all oil, gas, and/or natural gasoline, and/or all other hydrocarbon substances produced and saved from the land leased herein . . . ."

The lease form [Southland] provides that the Secretary has discretion to ascertain "value" for the computation. Thus paragraph 3(c) provides also that:

"During the period of supervision, 'value' for the purposes hereof may, in the discretion of the Secretary, be calculated on the basis of the highest price paid or offered (whether calculated on the basis of short or actual volume) at the time of production for the major portion of the oil of the same gravity, and gas, and/or natural gasoline, and/or all other hydrocarbon substances produced and sold from the field where the leased lands are situated, and the actual volume of the marketable product less the content of foreign substances as determined by the oil and gas supervisor. The actual amount realized by the lessee from the sale of said products may, in the discretion of the Secretary, be deemed mere evidence of or conclusive evidence of such value. When paid in value, such royalties shall be due and payable monthly on the last day of the calendar month following the calendar month in which produced; when royalty on oil produced is paid in kind, such royalty oil shall be delivered in tanks provided by the lessee on the premises where produced . . . ."

It appears that the royalty provisions are directed to production and sale at the field thus "produced and sold from the field." The due date for royalty payments is related to the month "in which produced" thus produced from the ground. When royalty oil is paid in kind it is to be delivered on the "premises."

The phrase "[t]he actual amount realized by the lessee from the sale of said products" referred back to oil, gas, natural gasoline, and "all other hydrocarbon substances pro-

duced and sold from the field." This portion is clearly limited by the first few words —"[t]he actual amount realized by the lessee." The "actual amount realized" can apply under the Secretary's construction to a lessee who realizes amounts from products sold or from *his* extraction plant but to those situations only.

The lease makes specific reference to the value of products of gas for royalty purposes to allow for the cost of manufacture as one choice with the "value" of gas as the other. Thus

"It is understood that in determining the value for royalty purposes of products, such as natural gasoline, that are derived from treatment of gas, a reasonable allowance for the cost of manufacture shall be made, such allowance to be two-thirds of the value of the marketable product unless otherwise determined by the Secretary of the Interior on application of the lessee or on his own initiative, and that royalty will be computed on the value of gas or casinghead gas, or on the products thereof (such as residue gas, natural gasoline, propane, butane, etc.), whichever is the greater."

This provision gives the typical gas value versus a rough net "value" of the product. This lease provision refers to the determination of the "value for royalty purposes of products." It thus describes what is to be done if royalty is to be applied to "products," but it does not say under what circumstances royalty shall be computed on products.

As described above, the Secretary has construed the lease and the regulations to require a computation based on products only when the lessee is the owner of the plant producing the products or on those who realize direct income from the sale of products.

Despite the several sentences following it, the controlling limitation as to royalty is the phrase "the actual amount realized," and the subsequent provisions are directed to such a determination with formulas and choices to accomplish that end.

*Regulations*

The regulations expand on the several lease provisions quoted above and quote portions, thus 30 C.F.R. § 171.13, 30 C.F.R. § 221.47, 30 C.F.R. §§ 221.51 and 221.52.

30 C.F.R. § 221.50 makes reference to products and subsection (b) provides:

"If the lessee derives revenue on gas from two or more products, a royalty normally will be collected on all such products."

This is specific as to a lessee who "derives revenue" on gas from products will pay a royalty on all such products. Again, the term "derives revenue" points only to a lessee who has a processing plant or a contract to share in the sale of products.

Section 221.50(c) provides:

"For the purpose of computing royalty, the value of wet gas shall be either the gross proceeds accruing to the lessee from the sale thereof or the aggregate value determined by the Secretary of all commodities, including residue gas, obtained therefrom, whichever is greater."

It appears that the trial court placed its principal reliance on this subparagraph (c) in arriving at an independent judgment as to the proper construction of the lease.

■ We cannot agree with the trial court that this subsection by itself or together with other regulations or lease terms is sufficient to set aside the Secretary's construction of his regulation and lease which was followed and applied without exception for these many years, a construction which has a perfectly reasonable basis in the lease and in the regulations. Furthermore it was and is in conformance with the practices in the industry as shown by the record.

We cannot overlook the express provision in the lease which states relative to "value" for royalty:

"The actual amount realized by the lessee from the sale of said products may, in the discretion of the Secretary, be deemed mere evidence of or conclusive evidence of such value."

The regulations contain similar provisions. These clear grants of authority cannot be

ignored in assessing the discretion of the Secretary.

■ We have described and quoted at some length the lease clauses and the pertinent provisions of the regulations. This has been done not to determine whether or not we agree with the administrative interpretation, but instead to describe the issue and to show the basis for the Secretary's position. When the prevailing doctrine in this circuit is then applied to these circumstances we must conclude that the administrative interpretation which prevailed through the years must be applied.

We have found no abuse of discretion in this respect by the Secretary and the trial court found none. There is no indication of action by the Secretary which could be characterized as arbitrary or capricious. The Secretary's position is consistent with case law in this circuit. *See Barby v. Cabot Corporation,* 465 F.2d 11 (10th Cir.1972).

■ The trial court's determination that dual accounting is required of all lessees must be and is set aside. The original construction placed on the lease and regulations by the Secretary as to this issue must be applied to and through the conclusion of these proceedings. The Secretary and the IBLA appear to have changed their positions in response to rulings on the point by the trial court during these proceedings.

### Fiduciary Duty of the Secretary

■ As noted above, the trial court held that the Secretary of Interior violated fiduciary standards in not applying the royalty provisions in the way in which the court construed them. In view of our holding above as to the basis for the Secretary's construction, in view of the discretion vested in the Secretary as to the regulation of oil and gas matters, in the absence of any finding or indication of abuse of discretion, and in view of the conformance of the construction to the general practices in the industry and the controlling case law, we find no basis for the trial court's determination as to fiduciary standards. We need not and do not decide whether or not the Secretary owes the tribe a fiduciary duty as to the matters under consideration.

### Gas Volumes

■ We have concluded that the trial court was correct in its holding that the volume measurements of gas in the past were correct as was the application of field prices. These points are fully developed in the record and by the trial court and no purpose would be served by a review of the facts in this opinion.

### Lease Development

■ The trial court held that there was no proof adduced to demonstrate a lack of development under the leases. This matter was so examined under the legal standards applicable to the circumstances which are well developed. This is a much litigated matter and there are well defined standards. The trial court applied these to the facts and we agree with the conclusion so reached.

Since there was no violation of lease terms or regulations as to development of the leaseholds, we do not reach the question as to whether the Secretary had a fiduciary duty as to this matter. The Secretary necessarily functioned within the lease terms and the regulations.

### Antitrust Issues

In its complaints the plaintiff advanced several antitrust claims based on alleged price-fixing by the defendants. In this position plaintiff's reliance was placed on the most part on the fact that long-term gas purchase contracts had been entered into between the lessees and Southern Union, the gas purchaser. The court found no evidence of price-fixing or restraint of trade. It found that the gas purchase contracts were typical since the 1930's of those used in the San Juan Basin by other purchasers. The court found that the contracts entered into by the lessees although similar in form were the result of independent business judgments and sound business reasons were evident.

The trial court laid particular emphasis on the uniform use by Southern Union of most favored nation clauses in its gas purchase contracts throughout the San Juan

Basin. We agree that this is a significant factor. The price evidence before the court demonstrates that the prices were generally in accordance with the national trends. The tribe in 1976 sought to sell its royalty gas to Southern Union at the same price.

As to the liquids produced at the Lybrook plant the evidence showed that they were but a very small part of the market. Supron produced when it operated the plant no more than a 3% market share. Southern Union also had a relatively small share of the market for liquids in the Basin. Southern Union purchased about 4% of the gas produced in the market area.

■ The extent of the market as determined by the trial court—the San Juan Basin—is a factual matter. The definition of a relevant market is a factual matter, only to be disturbed if the trial court's finding was clearly erroneous. *Telex Corp. v. IBM,* 510 F.2d 894 (10th Cir.1975). The basis of the determination is the interchangeability of the product controlled with other available products. *United States v. Du Pont & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264. We must hold that the trial court's finding is correct and supported by the record.

■ There existed some interlocking directors and some corporate affiliations from time to time. There were a series of reorganizations and mergers. The trial court concluded as to section 8 of the Clayton Act there may have been some technical violations. The tribe was, however, unable to show any ill effects flowing from interlocking directorships in some of the defendant companies. In the absence of proof of anticompetitive effects, the tribe could prevail only if interlocking directorships was a *per se* violation of the Sherman Act. The Supreme Court has shown great reluctance to add to the short list of types of economic activity that are *per se* Sherman Act violations. *White Motor Co. v. United States,* 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738. A *per se* violation is a naked restraint of trade with no purpose except to stifle competition. The tribe has not shown that interlocking directorships have this kind of "pernicious effect on competition and lack of

any redeeming virtue." *Northern Pac. R. Co. v. United States,* 356 U.S. 1, at 5, 78 S.Ct. 514, at 518, 2 L.Ed.2d 545. We agree with the trial court that the tribe has not made out a case for damages under section 8 of the Clayton Act. Section 8 forbids interlocking directorships, and there may have been a technical violation of this provision. However, the tribe offers only speculation on possible ill effects of interlocking directorships and no evidence of injury caused by a possible violation. It may be true that such a situation may indicate an opportunity to conspire, but affiliation does not by itself necessarily imply conspiracy to restrain trade. *H & B Equipment Co., Inc. v. International Harvester Co.,* 577 F.2d 239 (5th Cir.1978); *Knutson v. Daily Review, Inc.,* 548 F.2d 795 (9th Cir.1976). We affirm the trial court's holding that the tribe failed to carry its burden of showing injury that is connected in a causal manner to the violation. *Gottesman v. General Motors Corporation,* 436 F.2d 1205 (2d Cir.1971).

### The State Law Ceiling on Gas

■ The trial court held that the New Mexico Natural Gas Pricing Act, § 62–7–1 et seq. N.M.S.A.1978, did not apply to gas produced on the Jicarilla reservation. We must reverse this determination because there are no exceptions to the application of the state statute in its control of ceiling price on intrastate natural gas, and we conclude that the decisions of the Supreme Court demonstrate that the state statute does apply to the gas sales here under consideration.

The method for computing royalty is fixed in the lease which created the business relationship between the lessor and lessee, and which also granted the lessee an interest in the land. We have in this opinion described the pricing or value for royalty purposes. It is basically a field price in a large producing area and the ceiling price is fixed by federal and state laws as a price control designed to protect the ultimate gas consumers from excessively high prices. These ceilings necessarily override contractual relationships and there are no excep-

tions based on who the royalty owner may be. It appears that the State of New Mexico as a royalty owner is subject to the ceilings. It is a limit on the size of the royalty owner's check and the lessee's check.

The transaction here concerned is a sale to non-Indians on the reservation. This is the source of income to the tribe from the commercial and land ownership arrangement. The limit is thus on income as in *Moe v. Salish & Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96, and in *Washington v. Confederated Tribes of Colville Indian Reservation,* 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10. We must hold that the determination of this issue is controlled by the two cited cases.

There is by reason of the state price control act an effect on the money the tribe receives from the sales but there is no direct conflict with Indian self-government.

The relationship is with non-Indians as mentioned—sales on the reservation to non-Indians. In this respect we must consider the recent opinion of the Supreme Court in *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 and in *United States v. Wheeler,* 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303. In *Montana,* the Court quoting from *Wheeler* said of the tribe's right over the entire reservation:

" 'The areas in which such implicit divestiture of sovereignty has been held to have occurred are those involving the relations between an Indian tribe and non-members of the tribe . . . .

" 'These limitations rest on the fact that the dependent status of Indian tribes within our territorial jurisdiction is necessarily inconsistent with their freedom independently to determine their external relations. But the powers of self-government, including the power to prescribe and enforce internal criminal laws, are of a different type. They involve only the relations among members of a tribe.' "

The Court in *Montana* also said that the "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes,

and so cannot survive without express Congressional delegation."

The Court in *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, at 138, 102 S.Ct. 894, at 902, 71 L.Ed.2d 21, refers to the sharp distinction between Indian taxing acts and the lease covenants. It there said:

"As we observed in [*Washington v. Confederated Tribes of the*] *Colville* [*Indian Reservation*], *supra* [447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980)], the tribe's interest in levying taxes on non-members to raise 'revenues for essential governmental programs . . . is strongest when the revenues are derived from value generated on the reservation by activities involving the Tribes and when the taxpayer is the recipient of tribal services.' 447 U.S., at 156–157 [100 S.Ct., at 2082–2083]. This surely is the case here. The mere fact that the government imposing the tax also enjoys rents and royalties as the lessor of the mineral lands does not undermine the government's authority to impose the tax. See *infra,* [455 U.S.] at 145–148 [102 S.Ct. at 906–907]. The royalty payments from the mineral leases are paid to the Tribe in its role as partner in petitioners' commercial venture. The severance tax, in contrast, is petitioners' contribution 'to the general cost of providing governmental services.' "

In conclusion on the issue of the effect of the state price limitation it should be mentioned that a state regulation of prices is expressly provided for in the federal statute. Section 602(a) of the Natural Gas Policy Act of 1978 (15 U.S.C. § 3301 *et seq.*). Also the Conference Report on the Natural Gas Act states in part that the reference to state authority to control expressly states that authority is thereby "ceded" under the Commerce Clause to regulate prices to "affected states." This in itself would seem to answer a claim that state price control does not apply to the intrastate gas. Thus such state price control prices are applicable and further the federal price control prices are applicable to royalties.

The judgment of the trial court is affirmed except as to:

1. The dual accounting/value of gas issue, and as to this it must be reversed and the matter is instead to be controlled by the long-standing and pre-litigation administrative construction of the leases and regulations. The judgment must also be reversed as to the related holding of breach of fiduciary duty by the Secretary.

2. We must also reverse as to the application of state price control as hereinabove described, and we also hold that federal price control prices are applicable in the determination and computation of royalty.

SEYMOUR, Circuit Judge, concurring in part and dissenting in part.

I concur in the majority's holding on the antitrust issues for the reasons set out in Part IV below. However, I cannot agree with the remainder of the majority's opinion. The court today declares that it can determine whether the Secretary properly interpreted and applied regulations dealing with royalties from resources owned by the Jicarilla Apache Tribe without first deciding whether the Secretary owes any duty of trust to the Tribe in these activities. The majority then rejects the trial court's interpretation of those regulations. Finally, the court holds that the New Mexico Natural Gas Pricing Act, N.M.Stat.Ann. §§ 62–7–1 to –10 (1978) (NMNGPA), can function to diminish tribal royalties. Because I cannot agree with any of these conclusions, I must respectfully dissent.

## I.

## TRUST RESPONSIBILITIES

If the Secretary is obligated to act as a fiduciary to the Tribe in his administration of the Tribe's oil and gas reserves, and in his determination of what royalties the Tribe is due, then his actions must not merely meet the minimal requirements of administrative law, but must also pass scrutiny under the more stringent standards demanded of a fiduciary. Therefore, the need to determine whether the Secretary owes any duty of trust to the Tribe is unavoidable.

The notion that the Secretary, as a representative of the federal government, stands in a special relationship in general to the Indian tribes is not a novel proposition and needs neither extensive discussion nor citation. *See, e.g., United States v. Kagama,* 118 U.S. 375, 383–84, 6 S.Ct. 1109, 1113–14, 30 L.Ed. 228 (1886); *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1831). The Supreme Court has continually recognized "the distinctive obligation of trust incumbent upon the Government," *Seminole Nation v. United States,* 316 U.S. 286, 296, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480 (1942), in its dealings with the Indian tribes.[1] *See, e.g., United States v. Mitchell (Mitchell II),* —— U.S. ——, 103 S.Ct. 2961, 2972, 77 L.Ed.2d 580 (1983). Because of this trust relationship the Government, in both its executive and legislative branches, is held to a high standard of conduct, one consonant with its "moral obligations of the highest obligation and trust." *Seminole Nation v. United States,* 316 U.S. at 297, 62 S.Ct. at 1054. For the same reason, whenever doubt or ambiguity exists in federal statutes or regulations, such doubt is resolved in favor of the tribes. *See, e.g., Bryan v. Itasca County,* 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976).

In addition to the all-pervasive "general trust relationship between the United States and the Indian people ... [that] has long dominated the Government's dealings with Indians," *Mitchell II,* 103 S.Ct. at 2972, the Supreme Court has declared that other, context-specific trust relationships of varying depth and responsibility exist. *Id.; compare United States v. Mitchell (Mitchell I),* 445 U.S. 535, 542, 546, 100 S.Ct. 1349, 1353, 1355, 63 L.Ed.2d 607 (1980) (General

---

1. The Government's willing assumption of its obligations to Indian tribes is exemplified by the language of the treaty entered into July 1, 1852 in Santa Fe with the Apache Nation. Article 11 of the Treaty contains the promise "that the government of the United States shall so legislate and act as to secure the permanent prosperity and happiness" of the Apache Nation. Treaty with the Apaches, 10 Stat. 979, 980 (1855).

Allotment Act creates a limited trust relationship, not a fiduciary responsibility for management of allotted forest lands) *with Mitchell II,* 103 S.Ct. at 2972 (other federal statutes and regulations establish a full fiduciary relationship in management of allotted forest lands).

Both the Supreme Court and this circuit have recently set out the test for determining a trust relationship. In *Whiskers v. United States,* 600 F.2d 1332 (10th Cir. 1979), *cert. denied,* 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980), we made it clear that no particular words or phrases are critical to the finding of a trust relationship. "[T]he use of the word 'trustee' is not absolutely essential to the finding of a trust relationship when it is otherwise clear that Congress intended a trust relationship to exist." *Id.* at 1338. Rather, the test is whether "the relevant statutory and regulatory provisions [contain] an enumeration of duties which would justify a conclusion that Congress intended the Secretary to be a trustee." *Id.* In *Mitchell II,* the Court reviewed the statutes and regulations establishing the particular relationship between the government and the Indians to determine whether they "give the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians." 103 S.Ct. at 2972. Finding that they did so, the Court concluded, "[t]hey thereby establish a fiduciary relationship and define the contours of the United States' fiduciary responsibilities." *Id.*

In *Mitchell II,* the Supreme Court determined that the Secretary owed Indian tribes a duty of trust in administering the sale of timber on Indian lands. Because the statutory and regulatory scheme in *Mitchell II* parallels that involved here, I believe *Mitchell II* governs the resolution of this issue.

In finding a trust relationship in *Mitchell II,* the Court noted that the Secretary plays a "pervasive role" in sales of timber from Indian lands. 103 S.Ct. at 2969. The Court then carefully examined the statutes dealing with sales of timber on reservation land, the legislative history underlying the statutes, and the regulations explicating them,

finding it significant that "[t]he Department of the Interior ... 'exercises literally daily supervision over the harvesting and management of tribal timber.' ... Virtually every stage of the process is under federal control." *Id.* 103 S.Ct. at 2971 (quoting *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 147, 100 S.Ct. 2578, 2585, 65 L.Ed.2d 665 (1980)) (footnote omitted). The Court found that "the Government has 'expressed a firm desire that the Tribe should retain the benefits derived from the harvesting and sale of reservation timber,'" *id.* 103 S.Ct. at 2972 (quoting *White Mountain Apache Tribe v. Bracker,* 448 U.S. at 149, 100 S.Ct. at 2586). Accordingly, it held that a fiduciary relationship was established.

In addition to finding a trust duty expressed in the statutes and regulations, the Court declared that

"a fiduciary relationship necessarily arises when the Government assumes such elaborate control over forests and property belonging to Indians. All of the necessary elements of a common-law trust are present: a trustee (the United States), a beneficiary (the Indian allottees), and a trust corpus (Indian timber, lands, and funds). *'[W]here the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists* with respect to such monies or properties (unless Congress has provided otherwise) *even though nothing is said expressly in the authorizing or underlying statute* (or other fundamental document) about a trust fund or a trust or fiduciary connection.' *Navajo Tribe of Indians v. United States,* 224 Ct.Cl. 171, 183, 624 F.2d 981, 987 (1980)."

*Id.* (footnote omitted) (emphasis added).

Leasing of minerals located on Indian reservations is also a creature of federal statute. As in timber harvesting, the federal government's role in mineral leasing is pervasive and its responsibilities comprehensive. The Indian Mineral Leasing Act of 1938, 25 U.S.C. §§ 396a–396g (1976), requires the Secretary to: set the "terms"

and "conditions" for leasing, *id.* § 396b; approve leases, *id.* § 396a; establish lease sale procedures, *id.* § 396b; reject unsatisfactory bids, *id.;* require satisfactory performance bonds of lessees, *id.* § 396c; promulgate rules and regulations governing "all operations" under leases, *id.* § 396d; and approve leases for subsurface storage when necessary to avoid waste, or to promote conservation of resources, or to protect tribal welfare, *id.* § 396g. The evident purpose of the statute is to ensure that Indian tribes receive the maximum benefit from mineral deposits on their lands through leasing.

This interpretation is supported by the Act's legislative history. When the Act was proposed, the Secretary of the Interior urged that the legislation be enacted because "it is not believed that the present law is adequate to give the Indians the greatest return from their property." Senate Report No. 985 at 2 (1937); House Report No. 1872 at 2 (1938). Congress responded to the need to ensure that the Indians' welfare be protected and their natural resources be managed to the tribes' maximum benefit by emphasizing the Secretary's fiduciary obligations, directing the Secretary to approve lease sales only when they are "in the interest of the Indians." *Id.*

Interior has promulgated extensive regulations for managing leases under the Act. *See* 25 C.F.R. pt. 211 (1982). The regulations stress that the Secretary must act in the best interests of the tribes. *See, e.g.,*

*id.* §§ 211.3(b), .6(a), .9(b)(1), .12(a), .19, .21(a), .22, .27. Additional regulations, published in 30 C.F.R. Part 221, require the government to maintain comprehensive records of price and production, and to determine royalties. 30 C.F.R. § 221.12. These regulations detail in exhausting thoroughness the government's management and regulatory responsibilities. *See id.* pt. 221.

Because the statutes and regulations contain such an explicit and detailed enumeration of duties, in my view *Mitchell II* compels the conclusion that Congress intended the Secretary to be a trustee.[2] *See* 103 S.Ct. at 2971–72.

## II.

## BREACH OF TRUST

The trial court in this case concluded that Interior had breached its fiduciary duty in several respects: by failing to interpret correctly the royalty terms in the lease and regulations, by failing to insure that lessees comply with lease terms requiring diligent development, and by failing to insure the protection of leased lands from drainage. *Jicarilla Apache Tribe v. Supron Energy Corp.,* 479 F.Supp. 536, 547–51 (D.N.M. 1979). The trial court entered a declaratory judgment against the Secretary.[3] The majority opinion reverses the trial court's construction of the lease and the regulations, and finds it unnecessary to reach the other

2. This conclusion is supported by the Supreme Court's resolution of a case involving Interior-approved oil and gas leases on lands held by Indians under allotment act trust patents. In *Poafpybitty v. Skelly Oil Co.,* 390 U.S. 365, 88 S.Ct. 982, 19 L.Ed.2d 1238 (1968), the defendant lessee argued that the plaintiff Comanche Indians had no standing to sue under the lease because Interior "ha[d] such complete control over the lease that only [the Secretary could] institute ... court action" for impairment of the Indians' interests under the lease. *Id.* at 372, 88 S.Ct. at 985. The Court, noting that the government had exercised supervisory authority over oil and gas leases "in considerable detail," rejected the defendant's argument, holding that the Indians were not precluded thereby from bringing suit. *Id.* at 373, 88 S.Ct. at 986. Concerning Interior's duties in the situation, the Court declared that "[i]f the Government

does determine that there has been waste in violation of a lease, *it will of course satisfy its trust obligation* by filing the necessary court action." *Id.* (emphasis added).

3. The Tribe has, of course, another remedy for the Government's breach of its fiduciary obligations. "If in carrying out [its] role as representative [of the Tribe], the Government violated its obligations to the Tribe, then the Tribe's remedy is against the Government ...." *Nevada v. United States,* —— U.S. ——, 103 S.Ct. 2906, 2925 n. 16, 77 L.Ed.2d 509 (1983) (Rehnquist, J.). That action lies in the Court of Claims. *See* 28 U.S.C. § 1505 (1976); *United States v. Mitchell (Mitchell II),* —— U.S. ——, 103 S.Ct. 2961, 2965, 77 L.Ed.2d 580 (1983). The Tribe has instituted a suit against the Government in the Court of Claims, which has been stayed pending this appeal.

breach of trust issues. I disagree, and would affirm the trial court on each of these matters.

### A. *The Regulations*

The trial court stated the issue to be whether "the Secretary has breached his fiduciary duty because the method by which he computed royalties did not derive for the Tribe the highest royalties payable under the lease terms and the federal regulations." *Id.* at 549. The court then found that a breach had occurred. *Id.* at 551. The issue presented to us on appeal is one of interpretation of regulations, and not whether the Secretary was acting in accordance with his fiduciary obligations in promulgating the regulations initially.

At the time this litigation began, the Secretary used the BTU method to calculate royalties due the Tribe. One of the objectives sought by the Tribe was to compel Interior to calculate royalties using the net realization method as well, and to apply whichever method resulted in the greatest income to the Tribe. Sometime during the trial below, Interior evidently adopted the position that the lease and regulation terms authorized utilization of both methods of accounting (dual accounting), and that it has the discretion to require payment of royalties based on the method assuring the Tribe the highest return. *See* Rec., supp. vol. I, at 141–44.

On its cross-appeal to this court, Interior specifically "does not appeal the district court's holding that the 'dual accounting' method is the appropriate means of calculating royalties." Brief for the Secretary of the Interior at 9. Indeed, in its reply brief, Interior vigorously defends the trial court's holding on that issue against attack by defendant-lessees, concluding: "In short, the terms of the lease and the regulations grant the Secretary the authority to determine the value of the production at the lease on the basis of the value of the constituent commodities." Reply Brief for the Secretary of the Interior at 7. Moreover, the Secretary acknowledges his "broad discretion to determine the value of production in the way he considers will best protect the royalty interest of the lessor." *Id.* at 10–11.

Thus, the Secretary has adopted the view that interpreting the royalty terms to require dual accounting by the Jicarilla's lessees is reasonable. This interpretation is in accordance, so far as it goes, with the trial court's holding.

Without considering either Interior's current interpretation of its royalty provisions or its role as trustee, the majority disagrees with the trial court's interpretation and finds instead that dual accounting is not required under the regulations. The majority refuses to "set aside the Secretary's construction of his regulation and lease which was followed and applied without exception for these many years, a construction which has a perfectly reasonable basis in the lease and in the regulations." At 1559. It bases its opinion on the discretion granted the Secretary specifically by the lease terms and in "the regulation of oil and gas matters," because "the Secretary's interpretation was and is in conformance with the practices in the industry," and because the Secretary's action was not shown to be arbitrary or capricious. *Id.* The majority then states that "[w]hen the prevailing doctrine in this circuit is then applied to these circumstances we must conclude that the administrative interpretation ... must be applied," *id.* at 1560, adding that "[t]he Secretary's position is consistent with case law in this circuit. *See Barby v. Cabot Corporation,* 465 F.2d 11 (10th Cir.)," *id.*

I am at a loss to discern what the majority has in mind when it refers to "the prevailing doctrine in this circuit." Initially, I note that *Barby* dealt with the interpretation of lease terms entered into between two private parties and is therefore irrelevant to this case which involves the interpretation of federal regulations and fiduciary duties. I also do not see what relevance "industry practices" have to the Secretary's interpretation of federal law.

In my view, however, the most significant error the majority makes is its employment of administrative law analysis without considering what role, if any, the Secretary's fiduciary duty should play in a court's examination of his administrative action.

As I have pointed out, the Secretary's actions in a situation such as this are constrained by principles of Indian trust obligations as well as by standards of administrative law.

The Supreme Court has implicitly recognized that stricter standards apply to federal agencies when administering Indian programs. *See Morton v. Ruiz,* 415 U.S. 199, 236, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974); D. Getches, D. Rosenfelt & C. Wilkenson, Federal Indian Law 135–36 (1979). When the Secretary is acting in his fiduciary role rather than solely as a regulator and is faced with a decision for which there is more than one "reasonable" choice as that term is used in administrative law, he must choose the alternative that is in the best interests of the Indian tribe. In short, he cannot escape his role as trustee by donning the mantle of administrator, a principle recently made explicit by this court in *Jicarilla Apache Tribe v. Andrus,* 687 F.2d 1324 (10th Cir.1982):

> "We are convinced ... that the plain, mandatory terms of the regulations do not leave room for deference to this interpretation, which does not serve the interest of the Indians. If there is any doubt, the interpretation should be made liberally in favor of the Indians for whose protection these provisions were promulgated. *Antoine v. Washington,* 420 U.S. 194, 199, 200, 95 S.Ct. 944, 948, 43 L.Ed.2d 129; *Bryan v. Itasca County,* 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d

710. This rule of construction pertaining to statutes and treaties should also govern the interpretation of the regulations. Regulations are generally subject to the same rules of construction as statutes. *Rucker v. Wabash Railroad Co.,* 418 F.2d 146, 149 (7th Cir. [ (1969) ] )."

*Id.* at 1332.

Thus, the true issue in this case is not whether the Secretary's earlier application of the royalty terms was reasonable; rather, it is whether the alternative interpretation requiring dual accounting is also reasonable *and* better promotes the Tribe's interest. If so, dual accounting should have been required from the beginning.

Two sets of regulations and the lease terms are determinative of the Tribe's royalty claim. Title 25 and Title 30 of the C.F.R. each contain regulations addressing royalty calculations. The lease form at issue incorporates both sets of regulations by reference, and the royalty provision contained in the leases either quotes or paraphrases the relevant regulations printed in Title 25. Accordingly, the following discussion referring to both titles of the C.F.R. should be read as referring to the lease as well. The regulations at issue are reproduced in pertinent part in an appendix to this opinion.

The regulations contained in 25 C.F.R. require lessees to pay a royalty on the value or amount of all gas and other hydrocarbon substances produced from the lease.[4] 25

---

4. Natural gas is typically made up of several components in varying proportions. Generally, the gas at the wellhead consists of methane and ethane together with heavier components such as butane, propane, and natural gasoline. Where heavier components make up more than a standard percentage of the whole, the gas is called "wet" gas. When gas contains less than that percentage of heavier components, it is called "dry" gas. In the instant case, all of the gas produced from the tribal leases is wet gas.

Gas lessees may market wet gas in two ways. First, a lessee may choose to process the gas and market it separated into its constituent parts. The lessee does this by extracting the heavier components or "liquids" in a processing plant, and then selling the various products. Alternatively, the lessee may choose to sell the wet gas as is to a third party, who will then process the gas for further resale.

This case involves two methods of royalty calculations. The "BTU Method" calculates the value of gas produced by measuring the volume and BTU content of the wet gas at the wellhead, from which the "value" of the gas is derived. The second method, called the "net realization" or "aggregate value" method, is calculated by determining the values of the component gases after they have been extracted through processing. The "value" of the gas is the aggregate value of the constituent gases, less a cost of processing allowance.

"Dual accounting," requiring the computation of the value of wet gas by both methods and the subsequent payment of royalties on the basis of whichever method yields the higher value, allows a lessee to market gas by whichever method it chooses and ensures that the lessor royalty holder receives the maximum return on its gas.

C.F.R. § 211.13 (1982) (formerly codified at 25 C.F.R. § 171.13). Section 211.13 contains a "favored nation clause" for calculating value: "'value' ... may ... be calculated on the basis of the highest price paid or offered ... at the time of production for the major portion of ... gas ... [and] all other hydrocarbon substances produced and sold from the field .... The actual amount realized by the lessee from the sale of said products may ... be deemed mere evidence of or conclusive evidence of such value." *Id.* The regulation adds that the calculated value of products derived from treatment of gas should include an allowance for manufacturing costs. More importantly for the purposes of this case, however, the regulation states that "royalty will be computed on the value of gas or casing-head gas, or on the products thereof ... *whichever is the greater.*" *Id.* (emphasis added).

Title 30 of the C.F.R. contains extensive provisions to be used in calculating royalties. The threshold regulation, cited by the majority, states that

"(a) Royalty accrues on the dry gas, whether produced as such or as residue gas after the extraction of gasoline.

"(b) If the lessee derives revenue on gas from two or more products, a royalty normally will be collected on all such products.

"(c) For the purpose of computing royalty the value of wet gas shall be either the gross proceeds accruing to the lessee from the sale thereof or the aggregate value determined by the Secretary of all commodities, including residue gas, obtained therefrom, whichever is greater."

30 C.F.R. § 221.50 (1982). The second clause of subsection 221.50(c) authorizes Interior to use the aggregate value of the substances contained in wet gas, ensuring that the lessor will receive the true value of the gas and other hydrocarbons produced from its lands, regardless of the lessee's choice of marketing tactics. Subsection (c) does not by its terms require that the lessee itself extract liquids before the Secretary may utilize aggregate value computing; to the contrary, it appears to apply in *all* situations. By using the term "aggregate val-

ue," rather than "proceeds," the subsection allows the Secretary to use aggregate value in situations where the lessee does not in fact process wet gas or otherwise directly receive "proceeds" from the processing. The majority's interpretation ignores the distinction made in the regulation and, in fact, makes the first clause of subsection (c) irrelevant and redundant in light of subsection (b). The majority interprets subsection (c) to say in effect that when the lessee processes wet gas itself (and, presumably, sells the constituent products), the lessee must pay royalties on all the products—precisely what subsection (b) requires.

Moreover, practical considerations support this construction. The lessees argue that the dual accounting method of calculating royalties mandated by subsection 221.50(c) applies only when the lessees themselves extract the liquids from the wet gas and market the various products. They assert that dual accounting cannot be used when they merely sell unrefined wet gas to another company, because the other company is the one deriving the higher proceeds from the sales of the various derivative products. However, as I have stated, the purpose of the Indian Mineral Leasing Act is to ensure that Indian tribes receive the *maximum* benefit from mineral deposits on their lands, *see* slip op., dissent, at 6, and we should construe regulations enacted under this Act in light of this purpose. *Trustees of Indiana University v. United States,* 618 F.2d 736, 739, 223 Ct.Cl. 88 (1980); *Alaska Interstate Co. v. McMillian,* 402 F.Supp. 532, 555 (D.Del.1975); *see also Jicarilla Apache Tribe v. Andrus,* 687 F.2d 1324, 1332 (10th Cir.1982) (regulations generally subject to same rules of construction as statutes).

Adopting the lessee's construction of the regulations would too easily enable lessees of Indian oil and gas leases to avoid the purpose of the Act. If the value of wet gas is increased by processing, it is in every lessees' best interest to have their royalty payments calculated on the value of unrefined wet gas, rather than on the aggregate value of the various products. Under the lessee's construction, to obtain the advantage of royalties calculated on the lower,

wellhead price, all a lessee need do is sell the unprocessed wet gas to a cooperative third party, pay the lower royalties, and then reap the benefits of the higher proceeds from the extracted products through a sweetheart deal with the third party. In my view, it is as "reasonable" to construe these regulations in a way that prevents easy avoidance of the clear congressional intent of the Act as it is to adopt the majority's position.

The regulations thus provide support for the position urged by the Secretary on appeal. As I have noted, our initial determination is whether the trial court's and the Secretary's construction of the royalty regulations is reasonable. I believe that it is. Given two reasonable interpretations, Interior's trust responsibilities require it to apply whichever accounting method (BTU or net realization) yields the Tribe the greatest royalties. I would affirm the trial court on this point.

### B. *The Secretary's Administration of the Leases*

The trial court found that the defendant-lessees had not failed to diligently develop the leases in question. Nonetheless, the trial court found that fact fortuitous because the Secretary had "failed to adequately monitor development of these leases sufficiently to insure compliance with the terms thereof," thereby breaching his fiduciary duty to the Tribe. 479 F.Supp. at 547. Similarly, the trial court found that there was no drainage, but concluded that the Secretary had been negligent in monitoring the potential problem, and thus had breached his fiduciary duties. *Id.* at 548.

The record supports the trial court's findings on both of these issues, and I would affirm.

### III.

### PREEMPTION

By order issued January 26, 1981, the district court held that the New Mexico Natural Gas Pricing Act does not apply either to sale prices received by lessees, or to royalties received by the Tribe. The majority disagrees, holding that the NMNGPA applies to both, even though it "is a limit on the size of the royalty owner's check." At 1562. The majority acknowledges that "[t]here is by reason of the state price control act an effect on the money the tribe receives from the sales," but concludes that this harmful aspect of state regulation is permissible because "there is no direct conflict with Indian self-government," *id.* at 1562.

Initially, I note that the State disagrees with the majority's viewpoint concerning tribal royalties. The State argues that the Act's price ceilings will not necessarily affect the Tribe's royalties, because royalties need not be limited to proceeds received by the lessees.[5] *See* Brief of Cross-Appellant State of New Mexico at 56–58. This argument is in line with my construction of the federal regulations. In the State's view, the trial court correctly held that value for royalty purposes can exceed sale prices, and thus can exceed the price limits established by the NMNGPA. Indeed, the NMNGPA itself provides that the maximum allowable base prices established by the Act for natural gas "shall be exclusive of, . . . if provided for by contract, that portion of royalty payable on a value in excess of the contract sales price." N.M.Stat.Ann. § 62–7–3 (1982). Thus, in future contracts the Tribe can clearly avoid any effect upon its royalties by the Act. By implication, however, the Act might be interpreted to limit tribal royalties when *not* expressly avoided by contract terms, as in this case. I reject this conclusion for the reasons set forth in this opinion.

The majority's analysis of the effect of the New Mexico Act on "Indian self-government" relies upon a mistaken view of the significance of *Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980), and *Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976), which it cites as dispositive of this issue. I disagree

---

**5.** Interior also argues that value for royalty purposes can exceed governmentally imposed price ceilings. Reply Brief for the Secretary of the Interior at 8–12.

both with the majority's analysis and with its reliance on *Confederated Tribes* and *Moe*. My analysis is limited to the question whether federal law preempts the State from placing a ceiling on royalties paid to Indians. I need not address whether the NMNGPA may properly apply a ceiling on the sale of gas produced from the reservation by non-Indian lessees, because even if such a ceiling is appropriate it would not limit the determination of the Tribe's royalties under my construction of the regulations.

The Indian Mineral Leasing Act guarantees to Indian tribes maximum royalties from oil and natural gas located on tribal lands. In spite of clear congressional intent to ensure that Indian tribes receive the maximum return from their natural resources by way of royalties, the majority holds that a state can frustrate that policy. I would hold to the contrary, because I believe that the New Mexico Act is preempted by federal law to the extent that it adversely affects tribal oil and gas royalties.

The Supreme Court has recently discussed at length the principles to be used in determining whether a state civil statute is applicable within a reservation. *See White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 141–45, 100 S.Ct. 2578, 2582–84, 65 L.Ed.2d 665 (1980). In pertinent part, the Court noted that

> "[There are] two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members. First, the exercise of such authority may be pre-empted by federal law.... Second, it may unlawfully infringe 'on the right of reservation Indians to make their own laws and be ruled by them.' ... The two barriers are independent because either, standing alone,

can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members....

> "The unique historical origins of tribal sovereignty make it generally unhelpful to apply to federal enactments regulating Indian tribes those standards of pre-emption that have emerged in other areas of the law. Tribal reservations are not States, and the differences in the form and nature of their sovereignty make it treacherous to import to one notions of pre-emption that are properly applied to the other. The tradition of Indian sovereignty over the reservation and tribal members must inform the determination whether the exercise of state authority has been pre-empted by operation of federal law.... As we have repeatedly recognized, this tradition is reflected and encouraged in a number of congressional enactments demonstrating a firm federal policy of promoting tribal self-sufficiency and economic development. Ambiguities in federal law have been construed generously in order to comport with these traditional notions of sovereignty and with the federal policy of encouraging tribal independence.... We have thus rejected the proposition that in order to find a particular state law to have been preempted by operation of federal law, an express congressional statement to that effect is required.... At the same time any applicable regulatory interest of the State must be given weight, ... and 'automatic exemptions "as a matter of constitutional law" ' are unusual."

*Id.* at 142–44, 100 S.Ct. at 2583.

As *White Mountain Apache Tribe v. Bracker* makes clear, whether a state law interferes with Indian self-government is only half of the appropriate analysis.[6] The

---

**6.** The majority's reliance upon *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1980), is also misplaced. That case in·?lved very narrow questions of tribal sovereignty and regulatory authority that are not present in this case. As the Court itself noted, "the regulatory issue before us is a narrow one ... the question of the power of the Tribe to regulate non-Indian fishing and hunting on reservation land owned in fee by non-

members of the Tribe." *Id.* at 557, 101 S.Ct. at 1254. The Tribe is not asserting regulatory authority in this case. Additionally, the significance of a tribal land-base (lacking in *Montana*) to questions of a tribe's sovereign authority has been noted repeatedly by courts and commentators. *See, e.g., New Mexico v. Mescalero Apache Tribe,* —— U.S. ——, 103 S.Ct. 2378, 2384, 76 L.Ed.2d 611 (1983). Ac-

state law in question must also be examined for possible conflict with federal law. The Supreme Court has recently pointed out that the special doctrine of Indian preemption referred to in *White Mountain Apache Tribe v. Bracker* is considerably *broader* than other, more familiar forms of preemption. *See New Mexico v. Mescalero Apache Tribe,* —— U.S. ——, 103 S.Ct. 2378, 2386, 76 L.Ed.2d 611 (1983). State law and jurisdiction are preempted by operation of federal law if they interfere with or are incompatible with federal and tribal interests reflected in federal law,[7] unless the state interests at stake are sufficient to justify the effect. *Id.* Without addressing the Indian self-government issue, I would hold that to the extent the state law is interpreted to place a ceiling on the Tribe's royalties, it conflicts impermissibly with federal law.

The Supreme Court has emphasized the existence of a "firm federal policy of promoting tribal self-sufficiency and economic development." *White Mountain Apache Tribe v. Bracker,* 448 U.S. at 143, 100 S.Ct. at 2583; *see also New Mexico v. Mescalero Apache Tribe,* 103 S.Ct. at 2386–87. This policy is demonstrated by federal statutes authorizing the sale of tribal resources for the tribes' benefit, such as the Indian Mineral Leasing Act. *See id.* 103 S.Ct. at 2387; *see also White Mountain Apache Tribe v. Bracker,* 448 U.S. at 143 & n. 10, 100 S.Ct. at 2583 & n. 10. The right to receive maximum royalties is a benefit granted by Congress to the tribes in the Leasing Act. The state law here imposes a maximum price ceiling lower than the federal ceiling on sales of gas by non-Indian lessees, and thus could operate to decrease tribal royalties. This result would interfere with the congressional policy embodied in the Indian Mineral Leasing Act.

It is therefore clear to me that the New Mexico Act is preempted by operation of federal law insofar as it has any harmful effect upon the Tribe's royalty revenue, unless sufficient state interests are at stake.

The State points to no on-reservation actions by it justifying this intrusion. *See id.* 103 S.Ct. at 2387, 2390–91; *White Mountain Apache Tribe v. Bracker,* 448 U.S. at 150–51, 100 S.Ct. at 2587–88. In fact, as I have pointed out, New Mexico has conceded in this case that its ceilings on gas sales do not limit royalties. Nevertheless, the lessees assert that the State's justification for imposition of state price ceilings on gas *sales* by non-Indian lessees (that such price controls are necessary for the benefit of natural gas consumers) also justifies a comparable ceiling on tribal royalties under current contracts. The record contains no showing that the lack of a ceiling on royalties paid to Indians in New Mexico would have such a significant effect upon New Mexico consumers that imposition of the Act to limit royalties would be of vital interest to the State.

I conclude that the New Mexico Act is preempted under the principles enunciated in *White Mountain Apache Tribe v. Bracker* insofar as it might be applied to limit royalties received by the Tribe. The cases relied on by the majority are inapposite. The enterprise here—the production of reservation oil and gas—is far removed from those involved in *Confederated Tribes* and *Moe,* where the tribal contributions to the enterprises were "de minimus," *New Mexico v. Mescalero Apache Tribe,* 103 S.Ct. at 2390, and the product marketed was not generated from reservation resources, *compare Confederated Tribes* and *Moe with White Mountain Apache Tribe v. Bracker.* To the contrary, the production of tribal oil and gas clearly involves " 'value generated on the reservation by activities involving the Trib[e],' " *New Mexico v. Mescalero Apache Tribe,* 103 S.Ct. at 2390 (quoting *Confederated Tribes,* 447 U.S. at 156–57, 100 S.Ct. at 2082–83), and thus is protected from state interference.

The majority accepts the proposition that Congress delegated to the states the authority to regulate gas prices, and thus royal-

cordingly, general principles of tribal sovereignty applicable to tribal authority over tribal land should not be extrapolated from *Montana,* a narrow, fact-bound case.

7. Congress need not make any explicit statement for state law to be preempted in this context. *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 144, 150–51, 100 S.Ct. 2578, 2584, 2587–88, 65 L.Ed.2d 665 (1980).

ties, of gas produced on Indian reservations and sold intrastate. Far from being compelled, in my view this conclusion is belied both by the language of the Natural Gas Policy Act of 1978, 15 U.S.C. §§ 3311–3432 (Supp. V 1981) (NGPA) and by our prior caselaw.

The NGPA provides in a section entitled "Effect on State laws":

> "Nothing in this chapter shall affect the authority of any State to establish or enforce any maximum lawful price for the first sale of natural gas produced in such State which does not exceed the applicable maximum lawful price, if any, under subchapter I of this chapter."

*Id.* § 3432(a). The power to regulate on Indian reservations has always resided in the federal government. That power can only be delegated by express language.

> "As this court has recently emphasized, '[T]he cases stress that *regulatory* powers in Indian country or on Indian lands belong to the Congress except for inherent jurisdiction of the tribes. Congress may delegate this authority to the state, but when it does so it must be in specific terms.'"

*Mescalero Apache Tribe v. New Mexico,* 630 F.2d 724, 730 (10th Cir.1980) (quoting *United States v. New Mexico,* 590 F.2d 323, 328 (10th Cir.1978), *cert. denied,* 444 U.S. 832, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979) (emphasis added)), *vacated and remanded,* 450 U.S. 1036, 101 S.Ct. 1752, 68 L.Ed.2d 234 (1981), *aff'd,* 677 F.2d 55 (10th Cir.1982), *aff'd,* —— U.S. ——, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983); *see, e.g., Bryan v. Itasca County,* 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976); *Donovan v. Navajo*

*Forest Products Industries,* 692 F.2d 709, 711, 713 (10th Cir.1982). Section 3432(a) does not refer to Indian reservations, and clearly grants no authority to the states to regulate on-reservation activities. Absent a specific statement of congressional intent, it cannot represent congressional authorization for New Mexico to override the benefits conferred to the Indian tribes in the Indian Mineral Leasing Act.[8]

Even assuming that New Mexico has authority to regulate the sale price of gas sold by non-Indian lessees of Indian reservation leases, an issue that I have not reached, I conclude that Congress did not delegate to the states authority to place ceilings on the royalties the tribes are entitled to receive from such leases. Constitutionally, the New Mexico Act may not be permitted to affect the amount of royalties received by the Jicarilla Apache Tribe. The Secretary should not consider himself limited by wellhead prices conforming to the Act when establishing "value" for the purpose of computing tribal royalties.

### IV.

### ANTITRUST

In discussing section 8 of the Clayton Act, 15 U.S.C. § 19 (1981), the majority opinion employs a rule of reason analysis to determine whether the existence of interlocking directors in violation of the Act is illegal. The few courts and authorities that have considered the issue have held that conduct violative of section 8 is illegal *per se. See, e.g., Protectoseal Co. v. Barancik,* 484 F.2d 585, 589 (7th Cir.1973); P. Areeda, *Antitrust Analysis* ¶ 666 (3d ed. 1981); 4 Von Kalinowski, *Antitrust Laws and Trade Reg-*

---

**8.** The lessees argue that part of the legislative history of the National Gas Policy Act of 1978, 15 U.S.C. §§ 3311–3432 (Supp. V 1981) (NGPA), supports their delegation-of-authority argument. The Conference Report on the NGPA states:

> "The conference agreement provides that nothing in this Act shall affect the authority of any State to establish or enforce any maximum lawful price for sales of gas in intrastate commerce which does not exceed the applicable maximum lawful price, if any, under Title I of this Act. This authority extends to the operation of any indefinite price esca-

lator clause. The Congress enacts this provision with a recognition that it is ceding its authority under the commerce clause of the Constitution to regulate prices for such production to affected States."

H.R.Conf.Rep. No. 1752, 95th Cong., 2d Sess. 124–25, *reprinted in* 1978 U.S.Code Cong. & Ad.News, 8800, 8983, 9041. The first sentence of this discussion confirms the clear language of the statute. The last sentence is apparently at variance with the enacted language. As stated in text, Congress' power to regulate Indian affairs can only be delegated expressly.

*ulation* § 21.02[2]. It seems to me that if an interlocking directorate falls within section 8, which is very specific, the interlock is unlawful and no rule of reason analysis is necessary. Because the purpose of section 8 is to nip antitrust violations in the bud, *TRW Inc. v. FTC,* 647 F.2d 942, 946–47 (9th Cir.1981), injunctive relief for such a violation without proof of actual anticompetitive effect should be available under 15 U.S.C. § 26 (1982) to protect "against *threatened* loss or damage by a violation." *Id.* (emphasis added).

In this case, however, plaintiff is seeking treble damages under section 4 of the Clayton Act, 15 U.S.C. § 15 (1982), which requires "some showing of *actual injury* attributable to something the antitrust laws were designed to prevent." *J. Truett Payne Co. v. Chrysler Motors,* 451 U.S. 557, 562, 101 S.Ct. 1923, 1927, 68 L.Ed.2d 442 (1981) (emphasis added). Because I agree with the majority's conclusion that plaintiff here has failed to make the requisite showing of damage under section 4, I would affirm the district court on that basis only.

### APPENDIX

### Pertinent Regulations

25 C.F.R. pt. 211, Bureau of Indian Affairs (1982).

"§ 211.13 Rates of rentals and royalties under oil and gas leases.

"(a) The lessee shall pay . . . a rental of $1.25 per acre per annum in advance during the continuance thereof, together with a royalty of 12½ percent or the value of amount of all oil, gas, and/or natural gasoline, and/or all other hydrocarbon substances produced and saved from the land leased, save and except oil, and/or gas used by the lessee for development and operation purposes on the lease, which oil or gas shall be royalty free. . . . During the period of supervision, 'value' for the purposes of the lease may, in the discretion of the Secretary of the Interior, be calculated on the basis of the highest price paid or offered (whether calculated on the basis of short or actual volume) at the time of production for the major portion of the oil of the same gravity, and gas, and/or natural gasoline, and/or all

other hydrocarbon substances produced and sold from the field where the leased lands are situated, and the actual volume of the marketable product less the content of foreign substances as determined by the supervisor. The actual amount realized by the lessee from the sale of said products may, in the discretion of the Secretary of the Interior, be deemed mere evidence of or conclusive evidence of such value. . . . In determining the value for royalty purposes of products, such as natural gasoline, that are derived from treatment of gas, a reasonable allowance for the cost of manufacture shall be made, such allowance to be two-thirds of the value of the marketable product unless otherwise determined by the Secretary of the Interior on application of the lessee or on his own initiative, and that royalty will be computed on the value of gas or casinghead gas, or on the products thereof (such as residue gas, natural gasoline, propane, butane, etc.), whichever is the greater."

. . . .

"§ 211.21 Restrictions on operations.

"(a) Oil and gas leases issued under the provisions of the regulations in this part shall be subject to imposition by the Secretary of the Interior of such restrictions as to time or times for the drilling of wells and as to the production from any well or wells as in his judgment may be necessary or proper for the protection of the natural resources of the leased land and in the interest of the lessor. In the exercise of his judgment the Secretary of the Interior may take into consideration, among other things, the Federal laws, State laws, regulations by competent Federal or State authorities, lawful agreements among operators regulating either drilling or production, or both, and any regulatory action desired by tribal authorities."

30 C.F.R. pt. 221, Minerals Management Service (1982).

"§ 221.46 Quantity basis for computing royalties on natural gasoline, butane, propane, and other liquid hydrocarbon substances extracted from gas.

"(a) If the net output of a plant is derived from the gas obtained from only one

leasehold, the quantity of gasoline or other liquid hydrocarbon substances of which computations of royalty for the lease are based is the net output of the plant.

"(e) The supervisor is authorized, whenever in his judgment neither method prescribed in paragraph (b) and (c) of this section is practicable, to estimate the production of natural gasoline, butane, propane, or other liquid hydrocarbon substances from any leasehold from: (1) The quantity of gas produced from the leasehold and transmitted to the extraction plant, (2) the gasoline, butane, propane, or other liquid hydrocarbon content of such gas as determined by test, and (3) a factor based on plant efficiency or recovery and so determined as to insure full protection of the royalty interest of the lessor."

"§ 221.47   Value basis for computing royalties.

"The value of production, for the purpose of computing royalty shall be the estimated reasonable value of the product as determined by the supervisor, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, to the price received by the lessee, to posted prices and to other relevant matters.   Under no circumstances shall the value of production of any of said substances for the purposes of computing royalty be deemed to be less than the gross proceeds accruing to the lessee from the sale thereof or less than the value computed on such reasonable unit value as shall have been determined by the Secretary.   In the absence of good reason to the contrary, value computed on the basis of the highest price per barrel, thousand cubic feet, or gallon paid or offered at the time of production in a fair and open market for the major portion of like-quality oil, gas, or other products produced and sold from the field or area where the leased lands are situated will be considered to be a reasonable value."

"§ 221.50   Royalty on gas.

"The royalty on gas shall be the percentage established by the terms of the lease of the value or amount of the gas produced.

"(a) Royalty accrues on dry gas, whether produced as such or as residue gas after the extraction of gasoline.

. . . .

"(c) For the purpose of computing royalty the value of wet gas shall be either the gross proceeds accruing to the lessee from the sale thereof or the aggregate value determined by the Secretary of all commodities, including residue gas, obtained therefrom, whichever is greater."

"§ 221.51   Royalty on casing-head or natural gasoline, butane, propane, or other liquid hydrocarbon substances extracted from gas.

"A royalty as provided in the lease shall be paid on the value of one-third (or the lessee's portion if greater than one-third) of all casing-head or natural gasoline, butane, propane, or other liquid hydrocarbon substances extracted from the gas produced from the leasehold.   The value of the remainder is an allowance for the cost of manufacture, and no royalty thereon is required.   The value shall be so determined that the minimum royalty accruing to the lessor shall be the percentage established by the lease of the amount or value of all extracted hydrocarbon substances accruing to the lessee under an arrangement, by contract or otherwise, for extraction and sale that has been approved by the supervisor."

Pertinent Lease Terms

Lease Form No. 157, Oil and Gas Mining Lease—Tribal Indian Lands.

"3.   In consideration of the foregoing, the lessee hereby agrees:

"(a) Bond.—To furnish such bond as may be required by the regulations of the Secretary of the Interior, with satisfactory surety, or United States bonds as surety therefor, conditioned upon compliance with the terms of this lease.

"(b) Wells—(1) To drill and produce all wells necessary to offset or protect the leased land from drainage or in lieu thereof, to compensate the lessor in full each month for the estimated loss of royalty through drainage; *Provided,* That during the period

of supervision by the Secretary of the Interior, the necessity for offset wells shall be determined by the oil and gas supervisor and payment in lieu of drilling and production shall be with the consent of, and in an amount determined by the Secretary of the Interior; (2) at the election of the lessee to drill and produce other wells; *Provided,* That the right to drill and produce such other wells shall be subject to any system of well spacing or production allotments authorized and approved under applicable law or regulations, approved by the Secretary of the Interior and affecting the field or area in which the leased lands are situated; and (3) if the lessee elects not to drill and produce such other wells for any period the Secretary of the Interior may, within 10 days after due notice in writing, either require the drilling and production of such wells to the number necessary, in his opinion, to insure reasonable diligence in the development and operation of the property, or may in lieu of such additional diligent drilling and production require the payment on and after the first anniversary date of this lease of not to exceed $1 per acre per annum, which sum shall be in addition to any rental or royalty hereinafter specified.

"(c) Rental and royalty.—To pay, beginning with the date of approval of the lease by the Secretary of the Interior or his duly authorized representative, a rental of $1.25 per acre per annum in advance during the continuance hereof, the rental so paid for any one year to be credited on the royalty for that year, together with a royalty of 16⅔ percent of the value or amount of all oil, gas and/or natural gasoline, and/or all other hydrocarbon substances produced and saved from the land leased herein, save and except oil, and/or gas used by the lessee for development and operation purposes on said lease, which oil or gas shall be royalty free. During the period of supervision, "value" for the purposes hereof may, in the discretion of the Secretary, be calculated on the basis of the highest price paid or offered (whether calculated on the basis of short or actual volume) at the time of production for the major portion of the oil of the same gravity, and gas and/or natural gasoline, and/or all other hydrocarbon substances produced and sold from the field where the leased lands are situated, and the actual volume of the marketable product less the content of foreign substances as determined by the oil and gas supervisor. The actual amount realized by the lessee from the sale of said products may, in the discretion of the Secretary, be deemed mere evidence of or conclusive evidence of such value. When paid in value, such royalties shall be due and payable monthly on the last day of the calendar month following the calendar month in which produced, when royalty on oil produced is paid in kind, such royalty oil shall be delivered in tanks provided by the lessee on the premises where produced without cost to the lessor unless otherwise agreed to by the parties thereto, at such time as may be required by the lessor; *Provided,* That the lessee shall not be required to hold such royalty oil in storage longer than 30 days after the end of the calendar month in which said oil is produced; *And provided further,* That the lessee shall be in no manner responsible or held liable for loss or destruction of such oil in storage caused by acts of God. All rental and royalty payments, except as provided in section 4(c) shall be made by check or draft drawn on a solvent bank, open for the transaction of business on the day the check or draft is issued, to the payee designated by the Area Director. All such rental and royalty payments shall be mailed to the oil and gas supervisor for transmittal to the payee designated by the Area Director. It is understood that in determining the value for royalty purposes of products, such as natural gasoline, that are derived from treatment of gas, a reasonable allowance for the cost of manufacture shall be made, such allowance to be two-thirds of the value of the marketable product unless otherwise determined by the Secretary of the Interior on application of the lessee or on his own initiative, and that royalty will be computed on the value of gas or casinghead gas, or on the products thereof (such as residue gas, natural gasoline, propane, butane, etc.), whichever is the greater.

. . . .

"(f) Diligence, prevention of waste.—To exercise reasonable diligence in drilling and operating wells for oil and gas on the lands covered hereby, while such products can be secured in paying quantities; to carry on all operations hereunder in a good and workmanlike manner in accordance with approved methods and practice, having due regard for the prevention of waste of oil or gas developed on the land, or the entrance of water through wells drilled by the lessee to the productive sands or oil or gas-bearing strata to the destruction or injury of the oil or gas deposits, the preservation and conservation of the property for future productive operations, and to the health and safety of workmen and employees; to plug securely all wells before abandoning the same and to effectually shut off all water from the oil or gas-bearing strata; not to drill any well within 200 feet of any house or barn now on the premises without the lessor's written consent; to carry out at the expense of the lessee all reasonable orders and requirements of the oil and gas supervisor relative to prevention of waste, and preservation of the property and the health and safety of workmen; to bury all pipe lines crossing tillable lands below plow depth unless other arrangements therefor are made with the superintendent; to pay the lessor all damages to crops, buildings, and other improvements of the lessor occasioned by the lessee's operations; *Provided,* That the lessee shall not be held responsible for delays or casualties occasioned by causes beyond the lessee's control."

Rec., jt. app. vol. I, at 13–15.