**JICARILLA APACHE TRIBE, Plaintiff, Appellant, Cross-Appellee,**

v.

**SUPRON ENERGY CORPORATION, Southland Royalty Company, Donald P. Hodel, Secretary of the Interior, Gas Company of New Mexico, Defendants, Appellees, Cross-Appellants,**

**Exxon Corporation, Defendant, Cross-Claimant, Appellee, Cross-Appellant,**

**State of New Mexico, Applicant in Intervention and Appellant in 81-1680.**

**Nos. 81-1680, 81-1860, 81-1871 to 81-1874 and 81-1939.**

United States Court of Appeals, Tenth Circuit.

Jan. 23, 1986.

Robert J. Nordhaus and B. Reid Haltom of Nordhaus, Haltom & Taylor, Albuquerque, N.M., for plaintiff, appellant, cross-appellee Jicarilla Apache Tribe.

Maria A. Iizuka, Atty. (F. Henry Habicht II, Asst. Atty. Gen., and Anne S. Almy, Atty., Dept. of Justice, Washington, D.C.; William L. Lutz, U.S. Atty. and Raymond Hamilton, Asst. U.S. Atty., Albuquerque,

---

N.M., with her on brief), for appellee, cross-appellant Donald P. Hodel, Secretary of the Interior.

John R. Cooney (Peter J. Adang and Susan. R. Stockstill with him on brief) of Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, N.M., for appellee, cross-appellant Southland Royalty Co.

Mark F. Sheridan (Seth D. Montgomery, Gary R. Kilpatric and Wesley B. Howard, Jr., with him on brief) of Montgomery & Andrews, P.A., Santa Fe, N.M., for cross-appellant Gas Co. of New Mexico.

Bruce D. Black of Campbell & Black, P.A., Santa Fe, N.M., filed a brief for Unicon Producing Co., formerly Supron Energy Corp., defendant, appellee, cross-appellant.

Harold L. Hensley, Jr. of Hinkle, Cox, Eaton, Coffield & Hensley, Roswell, N.M., filed a brief for defendant, cross-appellant Exxon Corp.

Paul Bardacke, Atty. Gen. and Bruce Thompson, Asst. Atty. Gen., Santa Fe, N.M., filed a brief for State of New Mexico, applicant in intervention and appellant in 81–1680.

Kenneth J. Guido, Jr. of Sonosky, Chambers, Sachse & Guido, Washington, D.C., and Thomas Acevedo of Fredericks & Pelcyger, Boulder, Colo., filed a brief for amici curiae Shoshone and Arapahoe Indian Tribes.

Ernest J. Altgelt III, Houston, Tex. (John K. Dubiel and Thomas H. Burton, Houston, Tex., Jason Kellahin of Kellahin & Kellahin, Santa Fe, N.M. and Houston G. Williams of Williams, Porter, Day & Neville, Casper, Wyo., appearing of counsel on brief), for amicus curiae Conoco Inc.

Before HOLLOWAY, Chief Judge, SETH, McWILLIAMS, BARRETT, DOYLE,* McKAY, LOGAN and SEYMOUR, Circuit Judges.

---

* The Honorable William E. Doyle did not participate in this matter after December 31, 1985.

PER CURIAM.

These cases are before the court for rehearing en banc. The majority of the court adopts the prior dissenting opinion of Judge Seymour, reported at 728 F.2d 1555, 1563 (10th Cir.1984), with the exceptions and additions set out below.

■ As Judge Seymour noted in dissent, whether the New Mexico Natural Gas Pricing Act (NMNGPA), N.M.Stat.Ann. § 62-7-1 et seq. (1982), applies to sales by non-Indian producers to non-Indian buyers of gas produced on the reservation is an issue that need not be decided in this case and we specifically do not decide it. We adopt the view that under the NMNGPA, value for royalty purposes can exceed sales prices and thus can exceed the price ceilings. Given this construction, the Act creates no possible conflict with federal law, so we need not decide the preemption issue addressed in the dissent.

■ There is one issue not reached in the dissent which must now be decided. The trial judge held that the Tribe had stipulated away part of its claim against defendant Southland Royalty Company. The court said that "[a]cknowledging the inconsistency of this result, I state only that plaintiff is bound by the stipulation of counsel." 479 F.Supp. 536, 552 (D.N.M. 1979). The Tribe argues that the court's construction of its stipulation is not logical. Given the context in which the stipulation was made, we agree.

Prior to trial, the court granted partial summary judgment in favor of defendants on the issue of "value" for royalty purposes, holding that defendants had paid royalties on the "value" of minerals produced from the leased lands by basing royalties on the actual price received for sale of gas at the wellhead. Although the court ultimately reversed itself on this issue, its decision was the law of the case throughout the trial. The Tribe argues persuasively that when it stipulated, in the middle of the trial, that Southland had paid royalties at the appropriate rate on the consideration Southland had received, the stipulation only

applied to the situation where the sale price had been held by the court to be conclusive evidence of value. On appeal, Southland has provided no reason why the Tribe would drop its claim against Southland and not against other defendants. We thus conclude that the trial court misconstrued the stipulation.

We have considered the other arguments of the various defendants and conclude that they are without merit. Accordingly, the district court is affirmed in all respects except for its limitation on the Tribe's recovery against Southland. In this regard, the cause is reversed and remanded to the district court for computation of the additional amount owing from Southland to the Tribe.

SETH, Circuit Judge, dissenting:

I must dissent from the majority opinion.

The panel opinion in this appeal noted that there was no finding that the Secretary had acted in an arbitrary or capricious manner in reaching and continuing his construction of the regulations and the lease as to royalty payments. This is mentioned because this finding has unusual implications in this case. Thus it has to be assumed that the Secretary had performed all his functions as a public official, and had considered his duties to carry out national energy policies; to exercise his discretion as to the subject matter under the regulations; to consider the impact on public land leases generally; to carry out contractual obligations; and his duties to the parties with direct concern—the Indian lessors and the lessees. These considerations were of both the short and long range implications of his action. Again, since the Secretary did not act in an arbitrary or capricious way, he included an evaluation of his position as to the lessors. There is nothing whatever shown to the contrary. The duty to the Tribe, however it may be characterized, was thus among the elements considered. His general broad discretion under the statutes, regulations, and the leases was, of course, an element in his evaluation.

The Secretary in the execution of his duties gave what he considered appropriate weight to each element. The majority of the panel which first heard the case concluded that he had acted within his duties and functions and thus held it was not for the trial judge to redo the Secretary's actions and assume his functions.

The trial court had substituted its own views as to the weight and consideration to be given to the several elements. The trial court thus overturned completely the construction of the regulations and the leases established by the Secretary for 20 or 25 years. This it did by considering only one element in the mix and excluding all others. Thus the court held that the only factor or consideration was to "maximize" the immediate royalty revenues to the Jicarilla Apache Tribe. There was in its view nothing else to be considered. Thus, although the Secretary had evaluated all the elements and given weight to them (including a duty to the Tribe), he had in the court's view breached his fiduciary duty. This, again, because the Secretary's only duty was to "maximize" revenues and to do nothing else. If he did anything else it constituted a breach of "fiduciary duty." Under this view, of course, the Secretary had no discretion whatever under the regulations or leases, and no duty to the national energy policy, nor to public land policies, conservation or anything else. The only duty and function of the Secretary of the Interior was to "maximize" tribal revenues regardless. If this is his function he is not the Secretary of the Interior but a functionary for but one interest.

On the en banc consideration the Tribe again advances this only duty of the Secretary, but it fails to identify the extent, nature or the source of such a duty. It would not seem enough to pick up quotations from a variety of cases, and to apply them in this case regardless of context. There is no overall, all pervading "fiduciary duty" to the Tribe. It has to have its origin in some statute relating to the subject matter and applicable to the particular situation. This is what *United States v. Mitchell*, 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607, and *United States v. Mitchell*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580, teach. That is, there must be a statutory basis for the duty and a clear one. The particular statutes were brought forth in *Mitchell II.*

Congress has plenary power over the Indian tribes and their lands. A consideration of the relationships must start with this basic proposition. Congress has this complete authority and when it places with a public official the authority to perform a function and the power to control and to administer Indian property the grant must be clear and specific as to the particular property before a fiduciary duty arises. This is what *Mitchell I* and *II* hold. There is only a "fiduciary duty" when a statutory basis exists and the nature and scope of such duty is therefrom clear. As the Court said, the statute defines the "contours" of a duty. Again, there is no amorphous all-inclusive "fiduciary duty" out there.

The Tribe itself entered into the leases as lessor. It has the authority that any lessor has under an oil and gas lease to enforce its terms and conditions and to so manage the property. The Tribe has engaged attorneys to provide advice. Its revenues from oil and gas royalties have been large as this record demonstrates. In *Mitchell I* the Court stated that Congress intended that the Indians were to manage their lands rather than the United States. This must be the starting point and the initial assumption in this case.

In *Mitchell II,* as mentioned, the Court relied on several *specific* statutory provisions relating only to Indians and to the subject concerned to have created a fiduciary duty. It held that to create a duty the statutes must "clearly establish" the fiduciary relationship. It is worthwhile to consider the statutes in *Mitchell II:* 25 U.S.C. §§ 406 and 407 refer to timber on Indian land held under a trust or other patent. It provides that timber sales shall be made upon a consideration of the "needs" and "best interests" of the Indian owner; 25 U.S.C. § 407 refers to sales of timber on

unallotted reservation lands and provides such timber may be sold in accordance with sustained yield and with other standards *recited in the statute;* 25 U.S.C. § 466 directs the Secretary to make rules for the management of Indian forestry units; 25 U.S.C. § 318a covers roads on Indian reservations; § 323 empowers the Secretary to grant rights of way over Indian lands; § 324 covers consents for rights of way; and § 325 covers compensation. These were the specific statutes directed to Indian lands relied on by the Court in *Mitchell II.* The detail therein provided as to forestry practices demonstrate the needed detail to provide the existence and scope of the duty.

We have nothing comparable in the case before us. The plaintiffs seek to rely on the Indian Mineral Leasing Act, 25 U.S.C. § 396, to meet the "clearly establish" requirement, but its substance does not support such an argument. This Act does no more than authorize the Tribe to lease lands (with the approval of the Secretary) for minerals. Section 396(b) provides for bids for leases, but expressly provides that an organized Tribe (as here concerned) may lease according to its own constitution. Section 396c provides for bonds by lessees for compliance with leases and § 396d states that operations under the Indian leases shall be in accordance with rules and regulations promulgated by the Secretary. These are the general public land regulations and are not directed to Indian lands.

The General Allotment Act and the Indian Reorganization Act do not provide a basis for a fiduciary duty. Thus there are no prescribed standards—no "contours" for any management by the Secretary—only in accordance with the regulations *he prescribes.* This would seem at most to place his duty within a "reasonable care" standard along with everybody else.

There was no treaty with the Jicarilla Apaches. The Reorganization Act of 1934 does not supply a duty. There was no Congressional Act to create the Reservation.

Our cases, before *Mitchell I* and *Mitchell II,* rely on a general, all pervading "fiduciary duty," applicable in all dealings with Indian Tribes in all circumstances. Now however a fiduciary duty not only has to have its origin in statutory provisions, but it only has a meaning and scope derived therefrom. There is a new measure, a new standard, and the abundance of quotations of phrases from the older cases would seem to be no longer useful.

The opinion of the Court in *Nevada v. United States,* 463 U.S. 110, 103 S.Ct. 2906, 77 L.Ed.2d 509, is also significant as to several aspects of this case. It demonstrates the error in the remedy sought to be used by the trial court. Also, it considers circumstances where the Secretary of the Interior had duties in the same transaction to different entities one of which was the Pyramid Lake Paiute Tribe. The Court pointed out the diverse interests or claimants to the water there concerned and concluded that the Secretary had properly exercised his discretion. He had considered all elements and so discharged his duty. There is no hint in the opinion that the interest of the Paiute Tribe was the only consideration, and when it was included in the combined circumstances there was no breach of fiduciary duty as held by the trial court in the case before us. The fact that litigation was involved in *Nevada v. United States* is not significant as the action of the Secretary and his decision obviously preceded the litigation. The Court in *Nevada v. United States* said of the Secretary's several possibly conflicting obligations:

> "In this regard, the Government cannot follow the fastidious standards of a private fiduciary, who would breach his duties to his single beneficiary solely by representing potentially conflicting interests without the beneficiary's consent. The Government does not 'compromise' its obligation to one interest that Congress obliges it to represent by the mere fact that it simultaneously performs another task for another interest that Congress has obligated it by statute to do."

The Court in the same case quoted in a footnote the trial court's findings as to the

conflict and which characterized the decisions in the Department as within the scope of delegated duties and which were political and policy decisions. Of this the Court said:

"The District Court's finding reflects the nature of a democratic government that is charged with more than one responsibility; it does not describe conduct that would deprive the United States of the authority to conduct litigation on behalf of diverse interests."

It seems advisable to state a few facts in the case before us. The lease is the common form (or was) used for all public lands. The leases were executed by the Tribe and the original lessees in 1950. The gas produced is sold *at the wellhead* with a price adjustment for BTU content (thus the combustible gas and liquid content). The gas goes into *intrastate* commerce only. The Lybrook Plant near the Reservation extracts liquids from the gas produced by the leases in question and from gas produced elsewhere in the area from private and public lands. The liquid content of the gas varies from place to place. This plant operates most but not all the time. It is owned and operated by a stranger to the litigation. The extraction of liquids is for the transporters-owners of the gas which they have purchased at the wellhead from the defendant lessees. For a period of time, 1974–1979, the plant was owned by a defendant—Supron—but only for that period. No other lessee has had an interest in the plant. Extraction plants are common in and near gas fields throughout the country, including gas fields producing gas from the public lands under leases like the one in issue. The lessees were regularly billed for royalties by the USGS and its successor. These royalties were paid by the lessee-defendants. These computations were made in accordance with the Secretary's construction of the lease terms and regulations. The defendants thus acted only in response to the official line.

The regulations in issue need not be here described in detail. It is sufficient to point out that they divide, for the computation of royalty, lessees into two categories. The first are the lessees with interests in an extraction plant, and for these the regulation 30 C.F.R. § 206.106 is directed to such a lessee which thereby derives revenues from the products extracted at its plant. Royalty is thus based on what such lessee receives for the products. The second group are the lessees who do not have an interest in such a plant and for these the Secretary has discretion to use the actual amount received at the wellhead for the gas produced or to use the highest field price (30 C.F.R. § 206.103) with the BTU adjustment.

The record shows that the Secretary put Supron in the first category during the period when it owned-operated the plant. This was the Secretary's construction of the regulations and the accepted practice. The other lessees were placed in the second category as were all lessees with no plant ownership. This was also the generally accepted construction of the leases and regulations and the one uniformly followed by the USGS for all public land leases.

The trial court instead sought to place the lessees in both categories at the same time in requiring that royalties be computed on the higher of the two figures. There is no basis in the regulations to place a lessee in both. It thus required accounting from lessees as to product values and processing costs although strangers owned the plants and lessees had no access to the plant records. There was however a theoretical formula provided in the regulations.

The method the trial court devised was also incomplete in several important particulars. It made no allowance for shrinkage or line losses, for drip gasoline, or for the cost of transportation to the plant. The theoretical manufacturing allowance departed widely from the standards theretofore applied, and had no basis in the record. There are other omissions which demonstrate it was a matter to be left to the experts. The solution by the trial court also ignored the fact that the propane and butane are further processed. It is just as reasonable to include this processing as it

is the processing of the gas. The trial court's solution treats these leases differently from public land leases nearby under the very same regulations.

It became more apparent during the en banc oral argument that if it were held that there was a breach of duty by the Secretary the trial court applied the remedy to the wrong parties and so punished the lessees although it stated that they were in no way at fault. They paid what they were billed. It was also observed at the oral argument that the Tribe had an action pending against the Government in the Claims Court asserting a breach of duty arising from the same circumstances.

It has been suggested that some sort of a break in the sequence should be made in 1979 when the Secretary acceded to the trial court's orders. That somehow the dual accounting arose as an independent act of the Secretary. The record does not permit this independent act argument as the change came about only as a response to the order of the trial court. There is no administrative record to support such a "voluntary" change as is required.

The timing and the statements or references to the orders also demonstrate the involuntary nature of the change. However, equally persuasive was the argument of the Government at the en banc hearing which recited that before the court order there were some persons in the department seeking a change and some memos written, but they were unable to get official approval for a change.

It is also persuasive that these are the *only* Indian or public land leases in the country where this construction is now applied. If this is the only place it cannot be accepted that the change was voluntary. If the Secretary independently came to a decision to require dual accounting and to so change the long construction of the lease and regulations it was necessary for him to articulate the reasons for the change. *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443. This is both a procedural and substantive requirement. This was not done. It would have been necessary and the practice to give notice to those directly concerned to give them a chance to express their views. Again, there is no administrative record to describe or to support such a change. The conclusion must be reached that the change was not an administrative change but was instead brought about by the trial court's order.

The order was entered April 11, 1979. The Secretary relies on memos which did not reach the problem. This is particularly evident in an Associate Solicitor's letter of July 20, 1981. There is reliance for independent action placed on the IBLA *Supron* opinion, but this relies on the trial judge's order. This opinion expressly refers to "[w]here a United States District Court has ordered a lessee to adopt dual accounting...." In any event, the issue in the above *Supron* case only arose as to Supron's interest in the Lybrook plant described above and was in conformity with the then existing construction. It did not concern other lessees.

In the record no basis exists for a conclusion that the change in the Secretary's position as to dual accounting came about other than by the court's order. Again, it should be mentioned that the Government's oral argument at the en banc hearing stated that there were internal memos in the Department on the subject of dual accounting, but it had no official sanction before the court order. Again, these are the *only* Indian or public land leases in the country where dual accounting is required. This has continued since the purported change five or eight years ago. This must have some significance.

Thus the infirmities both substantive and procedural of the trial court's order continues to this day. If the dual accounting is supported it must be by reliance on the actions of the trial court.

I would set aside the order and judgment of the trial court.

McWILLIAMS and BARRETT, JJ., join in this dissenting opinion.