BURLINGTON RESOURCES OIL &
GAS COMPANY, f/k/a Meridian
Oil, Inc., Plaintiff,

v.

UNITED STATES DEPARTMENT OF
THE INTERIOR, Defendant.

No. Civ.A. 96–1936.

United States District Court,
District of Columbia.

July 16, 1998.

Charles L. Kaiser, Davis, Graham & Stubbs, L.L.P., Denver, CO, for Burlington Resources Oil & Gas Company, fka Meridian Oil Inc., plaintiff.

Donna S. Fitzgerald, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, for United States Department of the Interior, federal defendant.

Jill Elise Grant, Nordhaus, Haltom, Taylor, Taradash & Frye, Washington, DC, for Jicarilla Apache Tribe, movant.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

This case is brought to determine the extent of certain obligations of plaintiff Burlington Resources, Inc. ("Burlington")[1] as lessee under a number of oil and gas leases of various Indian tribal and allotted lands[2] from which Burlington produces natural gas. Defendant United States Department of the Interior ("DOI"), principally through its agent the Minerals Management Service ("MMS"), administers the leases on behalf of Indian lessors.

At issue is a final decision of DOI in May 1996, rejecting Burlington's appeal of orders issued by MMS in 1990 requiring Burlington to recompute royalties payable to the lessors dating as far back as 1970. Burlington brings this action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, for declaratory relief.

The parties have filed cross-motions for summary judgment, and the Jicarilla Apache Tribe ("Tribe"), a lessor and royalty owner of approximately 136 oil and gas mining leases, including several of which Burlington is the lessee, submitted a brief *amicus curiae* in support of defendant's motion. The Court finds sufficient material facts about the controversy to be undisputed to enable the case to be decided on the record.

---

1. Plaintiff was formerly known as Meridian Oil, Inc. and Southland Royalty Company. This memorandum refers to those entities collectively as "Burlington."

2. "Allotted lands" are lands owned by individual Indian allottees or their heirs which are subject to a restriction against alienation.

## I.

The contractual relations of the various tribes and lessees are governed by the provisions of Standard Lease Form 157 ("lease"), entered into on behalf of the tribes by DOI pursuant to federal statutes, *see* 25 U.S.C. § 396a *et seq.*, and implementing regulations. *See* 25 C.F.R. Part 171 and 30 C.F.R. Part 221. Under the terms of the lease and the applicable statutes and regulations, DOI has the duty to determine whether the lessees are performing according to the terms and conditions of the leases, and to determine the "value" of any minerals produced for purposes of computing royalties to be paid by the lessees. This dispute concerns the proper calculation of "value" on certain leases.

The gas produced from Burlington's leases generally contains heavier entrained liquid hydrocarbons (e.g., propane, butane, ethane), which are separated from dry methane (the "residue gas") by processing. Under a procedure called "dual accounting," the lessee must determine both (1) the value of the natural gas stream *before* it is processed to extract the heavier entrained liquid hydrocarbons ("wet gas"); and (2) the combined values of dry residue gas and separated liquid hydrocarbons, *after* processing of the natural gas stream, less allowed processing costs. The lessee then pays a royalty on the higher of the two values. In no event may the royalty be calculated on less than the lessee's "gross proceeds," i.e., the total consideration the lessee receives for the gas.[3]

From 1950 until the late 1970's DOI construed the lease provisions and regulations to require dual accounting only by those lessees that also owned the processing plant or received additional income for the products of processing; lessees selling the wet gas as extracted in "arm's-length" transactions were not required to dual account. In 1979, however, the U.S. District Court for the District of New Mexico held that dual accounting was required of *all* lessees of Indian lands. *Jicarilla Apache Tribe v. Supron Energy Corp.*, 479 F.Supp. 536 (D.N.M.1979). The

Tenth Circuit, *en banc*, ultimately affirmed the district court. *See Jicarilla Apache Tribe v. Supron Energy Corp.*, 782 F.2d 855 (10th Cir.1986) (*en banc*) ("*Supron II*"), *rev'g* 728 F.2d 1555 (10th Cir.1984) ("*Supron I*"), adopting dissenting opinion in *Supron I*, *cert. denied*, 479 U.S. 970, 107 S.Ct. 471, 93 L.Ed.2d 416 (1986).

Following the conclusion of the *Supron* litigation, MMS conducted reviews of the status of its other leases, which revealed that Burlington, apparently in keeping with DOI's pre-*Supron* practice, had not performed dual accounting when it sold gas under arm's-length contracts between January 1984 and December 1989. In an order issued on January 5, 1990 and amended on January 29, 1990 (collectively, the "MMS orders"), the MMS Dallas Area Compliance office directed Burlington to review its royalty payments for all of its Indian leases for that period, perform the required dual accounting calculations for each lease for which it had not done so, and retroactively pay any royalties due.

Burlington appealed the MMS orders to the MMS Director pursuant to 30 C.F.R. Part 290. On May 14, 1996, nearly six years after the appeal was taken, DOI's Assistant Secretary for Indian Affairs (the "Assistant Secretary") issued a decision upholding the MMS orders. Burlington filed suit here, under the Administrative Procedure Act, 5 U.S.C. § 706(2)(a), on August 21, 1996, claiming that the Assistant Secretary's decision to require dual accounting, both prospectively and retroactively, was arbitrary, capricious, an abuse of discretion, and not in accordance with law.

## II.

 DOI contends that Burlington is collaterally estopped to contest its obligation to recompute its liability for past royalties. The Court agrees. Southland Royalty Company—Burlington's predecessor-in-interest—was a party to *Supron II*, as were DOI and the Tribe. *Supron II* definitively held that

---

**3.** Simply stated, dual accounting requires the lessee to determine two values: the value of the gas "wet," before processing, and the combined values of the "dry" methane and the separated products after processing. In using the latter

method, the reasonable costs of processing, up to an allowed limit, may be subtracted from the total to arrive at the value for royalty purposes. The lessee then pays royalty on the higher of the two.

dual accounting is required under *all* Indian leases. Under the doctrine of collateral estoppel, a litigant will be barred from relitigating an issue in a second proceeding if: (1) the issue was "actually litigated" in the first action, after a full and fair opportunity for litigation; (2) the issue was necessarily determined in the first action by a disposition that is sufficiently final, on the merits, and valid; (3) the subsequent litigation is between the same parties or their privies; and (4) there are no special considerations of fairness, relative judicial authority, or changes of law. *See* 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4416, at 138 (2d ed.1987); *see also NOW v. Operation Rescue*, 747 F.Supp. 760, 766 (D.D.C.1990). Only the final factor remains in doubt here.[4]

Burlington contends that *Supron II*'s underlying reasoning has been rejected by subsequent decisions of the United States Supreme Court and the District of Columbia Circuit. In *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 179–80, 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989), the Supreme Court held that New Mexico could validly impose severance taxes on the same on-reservation production of oil and gas by non-Indian lessees as was subject to the tribe's own severance tax. Burlington argues that *Cotton Petroleum* implicitly rejects *Supron II*'s rationale respecting the primacy of fiduciary considerations and the "best interests of the Indian tribe." 728 F.2d at 1567.

*Cotton Petroleum* concerned primarily the difficult question of intergovernmental tax immunity—whether a State has the authority to tax a lessee's oil production on Indian lands even though the financial burden of the tax may fall on the United States, or on its ward (the tribe). *See Cotton Petroleum*, 490 U.S. at 175–76, 109 S.Ct. 1698. The Supreme Court acknowledged the presumption that a State may generally impose a nondiscriminatory tax on private parties with whom the United States or an Indian tribe does business, notwithstanding the fact that the ultimate taxpayer may be the United States or a tribe, unless Congress intended to grant them immunity. *See id.* at 175, 109 S.Ct. 1698. In deciding whether the Indian Mineral Leasing Act of 1938 granted such immunity, the Supreme Court recognized that "a purpose of the 1938 Act is to provide Indian tribes with badly needed revenue," *id.* at 180, 109 S.Ct. 1698, but that Congress did not intend to "remove all barriers to profit maximization." *Id.* The Supreme Court held that the statute's goal of enhancing tribal revenues was not sufficient evidence of Congress's intent to overcome the general presumption in favor of a State's ability to tax activities that have an indirect impact on federal interests. *See id.* at 179, 109 S.Ct. 1698 (finding no evidence that "Congress intended to guarantee Indian tribes the maximum profit available without regard to competing state interests").

*Cotton Petroleum* did not thus reject the general proposition that the Secretary of the Interior has a fiduciary duty to the tribes. The Supreme Court merely dismissed the notion that because the Indian Mineral Leasing Act was intended to raise revenues for tribes, it was also intended to insulate the income from otherwise appropriate levies. *See id.* at 179–80, 109 S.Ct. 1698. Important considerations of federalism took precedence over the Secretary's general duty to act on behalf of the tribe.

Burlington also contends that this Circuit, in the case of *Independent Petroleum Ass'n of America v. Babbitt*, 92 F.3d 1248 (D.C.Cir. 1996) ("*IPAA*"), impliedly rejected *Supron II*'s holding that the Secretary owes a fiduciary duty to the tribes. The *IPAA* court rejected MMS's interpretation of the term "gross proceeds" to include gas contract settlement payments as arbitrary and capricious, 92 F.3d at 1258–60, because it was inconsistent with the holding of a Fifth Cir-

---

4. Burlington also urges that the Court not consider the issue of collateral estoppel, since it was raised for the first time by the Tribe, participating as *amicus curiae*. *See United Parcel Serv., Inc. v. Mitchell*, 451 U.S. 56, 60 n. 2, 101 S.Ct. 1559, 67 L.Ed.2d 732 (1981). But a court may *sua sponte* consider questions related to its jurisdiction, even if raised for the first time by *amici*. *See Michel v. Anderson*, 14 F.3d 623, 625 (D.C.Cir.1994). Since the doctrine of collateral estoppel, like *res judicata*, "belongs to courts as well as to litigants," *sua sponte* consideration is proper. *See Stanton v. District of Columbia Court of Appeals*, 127 F.3d 72, 77 (D.C.Cir.1997).

cuit decision that DOI itself had expressly adopted *via* rulemaking and applied at subsequent administrative proceedings. *See IPAA*, 92 F.3d at 1253, 1260. Then, having concluded that DOI failed to meet the threshold arbitrary and capricious test, the *IPAA* court expressly declined to reach the fiduciary duty issue. *See IPAA*, 92 F.3d at 1258.

*IPAA* is completely compatible with *Supron II*'s holding that when the Secretary is faced with more than one "reasonable" choice as to the meaning of a lease provision when acting in a fiduciary capacity, i.e., when more than one choice would satisfy the "arbitrary and capricious" standard, he must choose the alternative that is in the best interests of the Indian tribe. *See Supron II*, adopting *Supron I* dissent, 728 F.2d at 1567. In other words, under *Supron II*, just as under *IPAA*, the Secretary's decision must be both "reasonable," i.e., not "arbitrary and capricious," *and* to optimum advantage of the trust beneficiary. *Accord Woods Petroleum Corp. v. Department of Interior*, 47 F.3d 1032, 1038 (10th Cir.1995).

### III.

■ As previously noted, prior to the conclusion of the *Supron* litigation, DOI's general practice had been not to require producers selling wet gas in arm's-length transactions to dual account. *See Supron I*, 728 F.2d at 1559; *see also Amoco Prod. Co.*, 143 I.B.L.A. 45, 51 (1998). As both *Supron II* and *IPAA* make clear, however, DOI's decision to abandon that position, even if made in the best interests of the Tribe, would not be permissible if it is arbitrary and capricious in other respects. Burlington contends that it is— that the MMS orders are arbitrary and capricious because they: (1) depart from long-standing policy without reasoned explanation, *see IPAA*, 92 F.3d at 1250–60; (2) will require Burlington to make computations calling for data it cannot obtain; and (3) in any event, oblige it to expend resources grossly disproportionate to any reasonably anticipated increase in royalties for the Tribe.

Notwithstanding its previous "long-standing policy" on dual-accounting, DOI's "reasoned explanation" for requiring dual accounting now is simple and obvious: to comply with a controlling judicial decision, namely, *Supron II*, precisely what it had failed to do in *IPAA* and for which it was faulted.

In cases in which a lessee/vendor encounters difficulty in obtaining data from processors to whom it has sold wet gas in arm's-length transactions, MMS has promulgated "theoretical" formulae to enable the necessary calculations to be made. The formulae allow lessees to derive necessary dual accounting information from publicly available sources, as well as from MMS itself, thus permitting calculations even where the lessee does not control the processing plant and the plant owner refuses to disclose the necessary information. *See Def.'s Opp. Br. at 23–26*. Burlington contends the formulae are flawed.[5]

■ The formulae are, however, grounded in both the regulations and the lease terms, and were never challenged in the course of administrative proceedings. *See United Transp. Union v. Surface Transp. Bd.*, 114 F.3d 1242, 1244 (D.C.Cir.1997). Assuming, nevertheless, that Burlington remains entitled to complain of them now, the Court observes that it must give "substantial deference to an agency's interpretation of its own regulations," *see Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994), and so long as the agency's interpretation of its own regulations is "within the range of reasonable meanings" the Court must uphold the agency's interpretation. *See Marymount Hosp., Inc. v. Shalala*, 19 F.3d 658, 661 (D.C.Cir.1994).

Furthermore, plaintiff's claims of hardship in complying with the dual accounting requirements are not convincing. Since *Supron II*, plaintiff has managed to value the gas produced from the leases involved in that case according to dual accounting require-

---

5. The MMS orders offer lessees three possible dual accounting formulae. Burlington contends that each formula requires information that is known only to the ultimate processor of the gas, and is unavailable to the lessee/wet-gas vendor in an arm's-length transaction.

ments, much of which was sold "wet" and at arm's-length, just as here.

Since the Court has been shown *no reason* to question the validity of *Supron II,* nor any "special considerations of fairness, relative judicial authority, or changes in law," Charles A. Wright, Arthur R. Miller & Edward H. Cooper § 4416, at 138, that might be said to undermine its authority as it relates to the present matter, the doctrine of collateral estoppel precludes the Court from independently reexamining whether dual accounting is required for the particular leases at issue here. From and after its decision in 1986, and pursuant to *Supron II,* Burlington has been properly required to dual account on those leases.

### IV.

■ Whether or not dual accounting may be *retroactively* imposed, however, was not specifically addressed in the *Supron* litigation. While the Tenth Circuit did order the lessees to dual account retroactively to 1970, there is no evidence of record that the issue was "actually litigated" in that case. As DOI properly concedes, therefore, Burlington is not estopped from raising that issue here.

■ Relying on DOI's previous practice, Burlington did not perform dual accounting for its arm's length transactions until the agency issued the MMS Orders in 1990. Citing cases prohibiting agencies from retroactively imposing new rules through adjudication, Burlington contends that DOI should not be permitted to retroactively apply its new interpretation of the regulations and lease terms for the period antedating the MMS orders of 1990. *See Retail, Wholesale & Dep't Store Union v. NLRB,* 466 F.2d 380, 390 (D.C.Cir.1972) (agency cannot retroactively impose new rule through adjudication if it would be inequitable); *see also Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (retroactive rule implemented through rulemaking is prohibited unless expressly authorized by Congress in governing legislation).

**6.** In support of its position, plaintiff cites legislative history and several cases referring to 30

But Burlington, like the respondent in a factually similar case from this Circuit, "seems to miss the distinction between an administrative agency's retroactive application of a judicial decision—the case before us here—and the agency's retroactive application of its own adjudicative decision." *See National Fuel Gas Supply Corp. v. FERC,* 59 F.3d 1281, 1289 (D.C.Cir.1995) ("*National Fuel*"). As in *National Fuel,* where the D.C. Circuit held that FERC was *required* to apply a Court of Appeals decision retroactively to alter transactions long past, so is DOI obliged to give retroactive effect to the Tenth Circuit's ruling that dual accounting is—and always has been—required of all lessees of Indian lands. *National Fuel,* 59 F.3d at 1288–89; *see also Public Serv. Co. of N.M. v. FERC,* 857 F.2d 833 (D.C.Cir.1988).

### V.

■ As a final matter, Burlington contends that, even if any retroactive payments are due, it cannot be compelled to pay late payment interest. Plaintiff claims that late payment interest is intended to serve as a "penalty"[6] that should not be imposed where, as here, the lessee acted exactly as DOI directed during the period in question. Furthermore, plaintiff points out that much of the interest in this case accrued during the six years DOI took to issue a decision in plaintiff's administrative appeal.

Regardless of whether the assessment of interest may be construed as a "penalty," the statutory mandate is clear. Under 30 U.S.C. § 1721(a), "[i]n the case of oil and gas leases where royalty payments are not received by the Secretary on the date that such payments are due, or are less than the amount due, the Secretary *shall* charge interest on such late payments ..." (emphasis supplied). Under the statute, the agency has no choice but to charge interest. *See also Amoco,* 143 I.B.L.A. at 53.

Furthermore, the interest serves as compensation for the Tribe's lost time value of money. Regardless of whether it took DOI 6 years to issue a decision, Burlington, rather

U.S.C. § 1721(a)'s interest rate as a "penalty."

than the Indian lessors to whom the money rightfully belonged, had the use of the money during that time.

For the reasons set forth above, it is, this 16th day of July, 1998,

ORDERED, that the motion of defendant Department of the Interior for summary judgment [15] is granted; and it is

FURTHER ORDERED, that the motion of plaintiff Burlington Resources, Inc. for summary judgment [14] is denied; and it is

FURTHER ORDERED, that this action is dismissed with prejudice.